# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Elaine Spencer, Individually and on Behalf of All Others Similarly Situated,<br><br><br><br>Plaintiff,<br><br>v.<br><br><br>RealPage, Inc., Sterling Apartment Homes, Air Communities REIT Corp, Greystar Real Estate Partners, LLC, Cushman & Wakefield, Inc., Lincoln Property Co., Bozzuto Property Management, Cortland Partners LLC, FPI Management, Inc., Mid-America Apartment Communities, Inc., Avenue5 Residential, LLC, Equity Residential, Camden Property Trust, and Essex Property Trust, Inc.,<br><br>Defendants. | **Case No.**<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff, Elaine Spencer, ("Plaintiff"), individually and on behalf of all others similarly situated, bring this Class Action Complaint ("Complaint") against RealPage, Inc., Sterling Apartment Homes, Air Communities REIT Corp, Greystar Real Estate Partners, LLC, Cushman & Wakefield, Inc., Lincoln Property Co., Bozzuto Property Management, FPI Management, Inc., Mid-America Apartment Communities, Inc., Avenue5 Residential, LLC, Equity Residential, Cortland Partners LLC, Camden Property Trust, and Essex Property Trust, Inc., (collectively "Defendants") and allege, upon personal knowledge as to her own actions and upon information and belief, including her counsels' investigations, as to all other matters, as follows:

## I.    NATURE AND SUMMARY OF THE ACTION

1.    Plaintiff, Elaine Spencer, challenges a cartel among lessors of multifamily residential real estate leases to artificially inflate the prices of multifamily residential real estate in the United States above competitive levels.

2.    Defendant RealPage, Inc. ("RealPage"), provides property management software for the multifamily residential real estate industry.

3.    RealPage's software, Yieldstar, is a pricing algorithm that monitors real-time lease-transaction data, allowing landlords to set rental prices based on their competition's prices. Yieldstar calculates the 'yield management' of the residential real estate industry and recommends price adjustments in response to certain market conditions such as demand or competition.

4.    The head of RealPage's Yieldstar program, explained that pricing software was developed to eliminate "empathy" in pricing apartment units.[1]

---

[1] Heather Vogell, *Rent Going Up? One Company's Algorithm Could Be Why*, ProPublica (Oct. 15, 2022).

5.      RealPage ensures that its Lessor clients understand that the Lessor clients must accept the algorithm's price to maximize their revenues. RealPage also induces its Lessor clients to artificially stress the rental market to improve rates. This has created a perpetually growing hub-and-spoke conspiracy, as more and more Lessors use RealPage, the more likely it is that RealPage has violated antitrust law.

6.      Before the introduction of pricing software, leasing agents would price and lease out apartments manually based on their own gut instincts and industry insights. This has changed overnight with the widespread adoption of pricing software.

7.      Around 2016, the industry's use of pricing software began to achieve "critical mass." As more and more Lessors began to use Yieldstar, the more data flowed into the company and affected its pricing algorithm.

8.      However, this was not the only way that RealPage grew its algorithm. In December 2017, RealPage acquired its biggest competitor Lease Rent Options, thereby gaining access to its client portfolio while at the same time shutting down competing pricing algorithms.

9.      RealPage continued a series of acquisitions, with the hopes of driving out competition and controlling more and more of the rental market, and as of October 7, 2022, RealPage maintains a portfolio of over 22 million units worldwide.

10.      There is an estimated 65 million rental homes in the United States rental market and RealPage software is used in at least 30% of the market.[2]

---

[2] Fitch Assigns First-Time 'B' IDR to RealPage, Inc.; Outlook Stable (Feb. 11, 2021). Available at: https://www.fitchratings.com/research/corporate-finance/fitch-assigns-first-time-b-idr-to-RealPage-inc-outlook-stable-11-02-2021

11.     RealPage claimed that its software would increase revenue and decrease vacancies and that using its Yieldstar software would eliminate the risk of collusion that could occur with manual pricing.[3] Ironically, Yieldstar appears to have done the exact opposite and provided a forum for leasing agents to collude and exchange competitive information in a much denser and faster manner than previously thought possible.

12.     Former Acting Federal Trade Commissioner, Maureen K. Ohlhausen discussed the potential of illegal price fixing via pricing algorithms back in 2017.[4]

> Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.
>
> If conduct was unlawful before, using an algorithm to effectuate it will not magically transform it into lawful behavior.
>
> Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices.

13.     Furthermore, at the same time that RealPage was increasing prices throughout the residential real estate pricing market, it was engaging in activities to artificially depress the supply of available units. During an earnings call in 2017, RealPage founder Steve Winn,

---

[3] *See* Note 1, *supra*.

[4] Maureen K. Olkhausen, Acting Chairman, U.S. Federal Trade Commission, *Should We Fear the Things That Go Beep In The Night? Some Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing*, United States of America Federal Trade Commission, (May 23, 2017). Available at: https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-_concurrences_5-23-17.pdf

discussed the profitability of raising rents while leaving some apartments vacant.[5] This strategy would only push rents higher, costing the average tenant while unlawfully enriching Lessors.

14.     As detailed below, RealPage and its Lessor clients constitute a price-fixing cartel, and the revenue growth they have achieved has been the result of coordinated price fixing.

15.     Plaintiff by this action seeks compensatory damages to remediate Defendants' unlawful conduct in violation of the Sherman Act, and to provide damages as well as injunctive relief barring Defendants from using Yieldstar software, or any other form of rental pricing software, or for any other such relief.

## II.     JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1131 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

17.     This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), Federal Rule of Civil Procedure 4(h)(1)(A), and the long-arm statute of Pennsylvania, 42 Pa. C.S.A. § 5322.

18.     Venue is proper in the Eastern District of Pennsylvania pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), the federal venue statute (28 U.S.C. § 1391(b)(1) as substantial acts and part of the events or omissions giving rise to the claims as alleged in this Class Action Complaint occurred in this District., and U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs,

---

[5] *RealPage's (RP) CEO Steve Winn on Q4 2017 Results – Earnings Call Transcript*, SeekingAlpha (Feb. 27, 2018). Available at: https://seekingalpha.com/article/4151484-RealPages-rp-ceo-steve-winn-on-q4-2017-results-earnings-call-transcript

there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendants to establish minimal diversity.

### III.    PARTIES

19.    Plaintiff, Elaine Spencer, is a citizen and resident of the Commonwealth of Pennsylvania, currently residing in Philadelphia, Pennsylvania.

20.    Defendant RealPage, Inc., is a Delaware corporation headquartered in Richardson, Texas.

21.    Upon information and belief, Lessor Defendant, Sterling Apartment Homes, located at 1815 John F Kennedy Blvd, Philadelphia, PA 19103 is a multifamily rental building that uses RealPage software to price its apartment units.

22.    Lessor Defendant Apartment Income REIT Corp., d/b/a Air Communities ("AIR"), is a publicly traded real estate investment trust headquartered in Denver, Colorado. Defendant AIR controls over 25,000 apartment homes, as well as earns hundreds of millions of dollars per year in revenue. Upon information and belief, Defendant AIR is the owner and/or operator of Defendant, Sterling Apartment Homes.

23.    Plaintiff, Elaine Spencer, is a current resident and lessee of Defendants, AIR and Sterling Apartment Homes.

24.    Lessor Defendant, Greystar Real Estate Partners, LLC ("Greystar") is a Delaware limited liability corporation headquartered in Charleston, South Carolina. It is the largest manager of multifamily rental real estate in the United States, with more than 782,900 multifamily units.

25.    Lessor Defendant, Lincoln Property Co. ("Lincoln"), is a Texas corporation headquartered in Dallas, Texas. Lincoln controls over 212,000 multifamily units.

26.    Lessor Defendant, Cushman & Wakefield, Inc. ("Cushman"), is a Delaware corporation headquartered in New York, New York. It controls over 172,000 multifamily units.

27.    Lessor Defendant, the Bozzuto Group ("Bozzuto), is a Maryland corporation, headquartered in Greenbelt, Maryland. It controls over 80,000 multifamily units.

28.    Lessor Defendant FPI Management, Inc. ("FPI") is a California corporation headquartered in Folsom, California. FPI controls over 150,000 multifamily units.

29.    Lessor Defendant Mid-America Apartment Communities, Inc. ("MAA") is a Tennessee corporation headquartered in Germantown, Tennessee. MAA controls over 100,000 multifamily units.

30.    Lessor Defendant Avenue5 Residential, LLC ("Avenue5") is a Delaware Limited Liability Company headquartered in Seattle, Washington. Avenue5 controls over 96,900 multifamily units.

31.    Lessor Defendant, Equity Residential ("Equity") is a Maryland real estate investment trust headquartered in Chicago, Illinois. Equity controls over 80,000 multifamily units.

32.    Lessor Defendant, Cortland Partners LLC, ("Cortland") is a Georgia company, headquartered in Atlanta, Georgia. Cortland controls over 60,000 multifamily units.

33.    Lessor Defendant, Camden Property Trust, ("Camden") is a Texas company, headquartered in Houston, Texas. Camden controls approximately 60,0000 multifamily units.

34.    Lessor Defendant, Essex Property Trust ("Essex") is a California real estate investment trust headquartered in San Mateo, California. Essex controls over 60,000 units.

35.    The Lessor Defendants and Co-Conspirators are various persons and entities, including Lessors, known and unknown to Plaintiff and not named as Defendants in this action,

who have participated as co-conspirators with RealPage and the Lessor Defendants in the offenses alleged and have performed acts and made statements in furtherance of the conspiracy.

## IV. FACTUAL ALLEGATIONS

### The Market for Residential Real Estate Leases

36.     The relevant product market is the market for the lease of multifamily residential real estate and the relevant geographic market is the United States.

37.     From the perspective of the consumer, multifamily rental apartment units are not an economic substitute for traditional homes, such as condominiums or single-family homes, as the requirements to obtain such traditional housing are much higher.

38.     To purchase traditional housing such as condominiums or single-family homes, the average consumer must make a substantial initial payment and/or obtain financing. There is also substantial upkeep once traditional housing is obtained, including taxes, homeowner association fees, utility bills, maintenance and repair costs. In contrast, multifamily residential units also offer amenities and security, as well as lower ongoing costs.

39.     Accordingly, the multifamily residential real estate lease market satisfies the Small but Significant Non-Transitory Increase in Price ("SSNIP") Test.

40.     The SSNIP Test identifies the smallest relevant market within which a cartel could impose a small but significant increase in price (typically 5%) without its customers turning away. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

41.     Here, the SSNIP test is satisfied and the market is properly defined.

42.     As described above and below, Lessors are able to increase prices "year over year", resulting in a consistent increase over 5% ever year. Yet despite the increases, renters have no substitute, and thus are forced to accept these increases.

### *RealPage's Acquisitions and Motivations*

43.     Yieldstar was developed by Lessor Camden, as a revenue management system in the early 2000's, when it was subsequently acquired by RealPage in 2002.

44.     With the announcement of its Yieldstar acquisition, RealPage revealed its key strategies and future plans with the algorithm.[6]

> Yieldstar is designed to help property owners optimize pricing of apartment inventory using sophisticated yield models that adjust apartment rents in real time to reflect imbalances in supply and demand.

> RealPage believes that active client participation is critically important to the development of world-class products, and the company is expanding the group of property owner/managers who preview the initial system by holding executive-level revenue management summits . . . to demonstrate the inner workings of the system. Input received from these summits will be factored into subsequent releases of the product. The summits will discuss eight elements of revenue management: 1) Competitive Rent Analysis; 2) Lease Management; 3) Supply Forecast; 4) Demand Forecast; Pricing Engine; Lease Term Price Adjustments; Renewal Price Adjustments; Renewal Price Adjustments.

45.     In 2004, RealPage acquired Re-Opt, a company focused on revenue optimization systems for the multifamily sector. Notably, Re-Opt was headed by Jeffrey Roper, a former airline executive.[7] Roper would head the Yieldstar division as part of the acquisition.

---

[6] *RealPage Acquires YieldStar Multifamily Revenue Management System*, RealPage (July 19, 2002). Available at: https://www.RealPage.com/news/RealPage-acquires-yieldstar-multifamily-revenue-management-system/
[7] *RealPage Expands M/PF Research Product Line With Acquisition Of RE-Opt*, RealPage (June 16, 2004). Available at: https://www.realpage.com/news/realpage-expands-mpf-research-product-line-with-acquisition-of-re-opt/

46.     Jeffrey Roper, was at the center of a similar antitrust scandal in the 1980s, when his company and other major airlines developed similar price-setting software. The federal government investigated the airlines for antitrust activity. It reached settlements with several airlines, all of which agreed to change how they used the technology. Reportedly, at one point federal agents removed a computer and documents from Roper's office.[8]

47.     Roper allegedly saw an opportunity to disrupt the housing rental industry in the United States, and began developing software to set prices for rental units based on an algorithm. He appears to have successfully replicated the same core idea that was prosecuted in the 1980's in the airline industry, but for the multifamily residential industry.

48.     By 2005, RealPage announced that Yieldstar had successfully produced positive results at Lessor Camden's properties.[9] The same Lessor that RealPage had acquired its algorithm from in 2002. After years of development, Yieldstar was finally ready to be launched.

49.     Since its initial acquisition of the Yieldstar software in 2002, and Re-Opt in 2004, RealPage has been engaged in an acquisition spree to increase its client portfolio.

50.     In December 2017, RealPage acquired its biggest competitor Lease Rent Options ("LRO"), thereby gaining access to its client portfolio while at the same time shutting down competing pricing algorithms.

51.     In December 20, 2019, RealPage acquired Buildium. Buildium offered a similar property management software program to approximately 2 million residential units.[10]

---

[8] See Note 1, *supra*.
[9] *RealPage's YieldStar™ Revenue Management System Empowering On-site Staff, Managers at Camden,* RealPage (Sep. 12, 2005). Available at: https://www.realpage.com/news/realpages-yieldstaramptrade-revenue-management-system-empowering-on-site-staff-managers-at-camden/
[10] Julia Falcon, *RealPage buys Buildium for $580* million, Housingwire (Dec. 20, 2019). Available at: https://www.housingwire.com/articles/RealPage-buys-buildium-for-580-million/

52.      In October 7, 2022, RealPage acquired yet another competitor, Knock CRM.[11]

53.      As of October 7, 2022, RealPage maintains a portfolio of over 22 million units worldwide. There is an estimated 65 million total rental home market in the United States, of which RealPage software is used to price approximately 30%. [12]

### *Traditional Leasing Strategies and RealPage's Strategies*

54.      Before RealPage facilitated collusion among Lessors, leasing agents acting independently tried to maximize occupancy.

55.      The traditional maxim for lessors, or the "keeping the heads in the bed", was to maximize residency through pro-consumer concessions such as gifts, promotional offers, giveaways, and rent waivers, etc.[13]

56.      Additionally, some leasing agents would undercut the average market price in order to maintain their volume of tenants. These actions helped create a stable and competitive market for the average consumer, as well as minimize any vacancies. One executive at a development company stated "we learned that if you were not 95 percent-plus occupied, the asset was failing."[14]

57.      The introduction of pricing software upheaved these beliefs.

58.      According to Roper, leasing agents would be 'too empathetic' in pricing available units, and Roper and RealPage sought to eliminate the human aspect from the pricing equation.[15]

---

[11] *RealPage Announces Definitive Agreement to Acquire Knock CRM*, RealPage (Sep. 30, 2022). Available at: https://www.RealPage.com/news/knock-acquisition/
[12] *See* Note 2, *supra*.
[13] Joe Bousquin, *In the Back Office, Revenue Management Software is Causing a* Revolution, Multifamily Executive, (April 20, 2009). Available at: https://www.multifamilyexecutive.com/technology/in-the-back-office-revenue-management-software-is-causing-a-revolution_o
[14] *Id.*
[15] *See* Note 1, *supra*.

59.    RealPage's first test site with Yieldstar proved to be wildly successful, as its first client began to raise rents and earn higher profit despite having high turnover.

> What we found was that driving our turnover rate up actually captured additional revenue . . . while turnover expenses increased by $2.5 million, revenue increased by $12.5 million. Keeping the heads in the beds above all else is not always the best strategy.[16]

60.    Accordingly, RealPage's entry into the industry was seen as a huge boon to the bottom line for Lessors.

61.    As early as 2007, the industry began taking note of the success of RealPage and its biggest competitor LRO and that they "lead the pack."[17]

62.    When discussing the rise of pricing software, one real estate executive told the industry publication Yield Pro noted that "a rising tide lifts all boats."[18] According to Roper and other executives, "One of the greatest threats to a landlord's profit, was other firms setting rents too low at nearby properties. . . If you have idiots undervaluing, it costs the whole system."[19]

63.    RealPage happily pushed these aspects of its Yieldstar software, including testimonials from executives on its website.

> "The beauty of YieldStar is that it pushes you to go places that you wouldn't have gone if you weren't using it."[20]

> "We over-achieved our market by 4.3%, and earned a profit of $1.4 million. . . Yieldstar has unparalleled access to market data that allows us to get insight into all of our markets

---

[16] See Note 13, *supra*.
[17] Wendy Broffman, *The Bottom Line on Revenue Management*, YieldPRO (April 1, 2007). Available at: https://yieldpro.com/2007/04/the-bottom-line-on-revenue-management/
[18] *Id*.
[19] See Note 1, *supra*.
[20] *Id*.

and get insight into . . . what everyone in the industry is doing and make decisions appropriate on a lot of different fronts."[21]

"There are times you can have a lower percent occupancy, and a higher rent."[22]

64.     Accordingly, sometime around 2016, the industry's use of pricing software began to achieve 'critical mass' through 'data convergence.'[23] As more and more property managers began using pricing software to push the boundaries of what could be charged for higher rent, RealPage received more and more data to fuel its algorithm.

65.     RealPage and participating Lessors, thus find themselves in a symbiotic relationship, where the bigger each becomes, so too do the rewards. RealPage and participating Lessors have either tacitly or expressly agreed to not compete on price, but to instead allow participating Lessors outsource their pricing decisions.

66.     By doing so, RealPage prices dictate the market conditions, and it as if RealPage and its participating Lessors were acting as a single unit dominating the market.

67.     It is reported that Lessors pushback on about 10-20% of RealPage's pricing strategies – or otherwise stated, RealPage's pricing strategies are accepted 80-90% of the time.[24] In some instances, it appears that some leasing agents accept 100% of the recommended prices set by RealPage.

---

[21] *Yieldstar Revenue Management: Client Outperforms by 4.3%*, RealPage. Available at: https://www.realpage.com/videos/revenue-management-software-review-venterra/
[22] *Yieldstar Revenue Management Optimizes Rent Pricing*, RealPage. Available at: https://www.realpage.com/videos/yieldstar-optimizes-rent-pricing/
[23] *See Note 1, supra*, quoting *What's Revving Revenue Management,* National Apartment Association (September 2016). Available at: https://www.documentcloud.org/documents/23131072-screencapture-naahq-org-news-publications-units-september-2016-article-whats-revving-revenue-management-2021-05-20-11_07_45?responsive=1&title=1)
[24] *See Note 1,* supra.

68.    Additionally, RealPage makes it difficult for Lessors to veer from the course. RealPage's 'Revenue Management Advisors' police the Lessors, and oversee the Lessor's pricing strategies. Leasing agents must provide justifications to reduce rent, or to diverge from the pricing strategy.

69.    Furthermore, RealPage's software is used to stagger lease renewal dates for Lessors' properties. Staggering renewal dates this way, avoids temporary periods of oversupply resulting from the natural ebb and flow of the market.[25] This reduces the incentive for leasing agents to compete with the market, as each participant stands to benefit from this arrangement. Competing for the market share has become nonexistent as a result when these oversupply periods have virtually disappeared.

70.    As a result of RealPage's aggressive pricing, rents have consistently gone up across the country for the past decade.

71.    As one RealPage executive described it, "I think [Yieldstar is] driving it, quite honestly. . . As a property manager, very few of us would be willing to actually raise rents double digits within a single month by doing it manually."[26]

*Plus Factors*

72.    The market for multifamily residential real estate is characterized by multiple factors, or 'plus factors' that render the industry susceptible to unlawful activity, such that the formation, maintenance, and efficacy of a cartel is more likely than not.

---

[25] *Outperform in a Down* Market, RealPage. Available at: https://www.realpage.com/ebooks/outperform-in-a-down-market/.
[26] *See* Note 1, *supra.*

73.    These plus factors include: 1) exchanges of completely sensitive information among horizontal competitors and numerous opportunities and avenues to collude; 2) high barriers to entry for competitors; 3) high barriers to exit for consumers and inelasticity of consumer demand; 4) relative fungibility of residential real estate leases;  and 5) motives to conspire.

74.    First, RealPage's participating Lessors, directly, and via RealPage's algorithm, share sensitive financial information with each other. Previously, a Lessor had no unilateral interest in disadvantaging itself relative to its competitors by giving away confidential information. Despite being competitors, participating Lessors now share pricing strategies as well as adhere to the same pricing principles as set by RealPage. While RealPage claims that its program is used to prevent antitrust activity, it has only created it on a larger scale. RealPage has held frequent events and conferences and maintained forums for use for participating Lessors ever since its acquisition of Yieldstar in 2002.[27] RealPage additionally operates a website called the Idea Exchange, whereby Lessors can provide ideas and requests for future product releases.[28]  Lessors can also join committees to "make new contacts in the industry, get products answered, and learn how to more effectively use their system."[29]

75.    Former Federal Trade Commissioner, Maureen K. Ohlhausen discussed the potential of illegal price fixing via pricing algorithms back in 2017.[30]

> Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.

---

[27] *See* Note 6, *supra*.

[28] *Best Practices for the Idea Exchange*, RealPage. Available at: https://www.realpage.com/user-group/best-practices/

[29] The RealPage User Group, available at: realpage.com/user-group/

[30] *See* Note 4, *supra*.

If conduct was unlawful before, using an algorithm to effectuate it will not magically transform it into lawful behavior.

Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices.

This sharing of information is a super plus factor. As described by legal scholars, "In an industry where the product made by different firms is largely homogenous, a shift in the incentives of sales forces across firms in an industry to "price before volume" leads to the strong inference of explicit collusion, namely, it is a super plus factor."[31] This principle is clearly demonstrated by the multifamily residential real estate industry. An industry that was once dominated by competitors seeking to put 'heads in beds' has now turned increasingly friendly to one another. As indicated by real estate executives, what matters now is price.[32]

76.    Second, multifamily residential real estate property owners and operators face significant barriers to entry such as high acquisition and maintenance costs. Small multifamily residential units can cost millions of dollars, not to mention the huge complexes that only the

---

[31] William E. Kovacic, Robert C. Marshall, Leslie M. Marx, and Halbert L. White, "Plus Factors and Agreement in Antitrust Law," Michigan Law Review, Vol. 110:393 (2011).
[32] *See* Note 15, *supra*.

largest corporations can afford to run. Instances like these demonstrate the difficulty for new competitors to enter the market.

77.    Third, the average consumer oftentimes cannot afford alternatives to multifamily residential real estate units, if any such exist. Consumers do not have the same access to capital as do large commercial entities, and can sometimes be forced to choose to lease a multifamily residential unit. There is no reasonable or realistic alternative for the average individual.

78.    Fourth, Multifamily residential real estate properties are especially fungible, especially when comparing different categories of properties when controlling for characteristics of properties, such as the number of bedrooms, bathrooms, location, etc. Lessors have explained that RealPage's pricing looks at similar competitor properties as it relates to competitor apartment pricing. Accordingly, it is possible for an algorithm to substitute, categorize, and price individual apartment units as if they were commodities.

79.    Finally, RealPage provides Lessors with a motive to conspire by advertising revenue increases that would otherwise not be possible. RealPage allows Lessors to increase their revenue by as much as 14% in some instances.[33]

**IV.    CLASS ACTION ALLEGATIONS**

80.    Plaintiff brings this action as a class action pursuant to Rule 23 *et seq.* of the Federal Rules of Civil Procedure on behalf of the Class.

81.    Plaintiff proposes the following Class Definition:

> **All persons and entities in the United States, that are direct purchases of multifamily residential real estate leases from a Lessor participating in**

---

[33] *South Region Sees Most Pandemic Era Revenue Growth*, RealPage. Available at:
https://www.realpage.com/analytics/south-region-sees-most-pandemic-era-revenue-growth/

**RealPage's pricing software, at any time during the period of July 19, 2002 until the Defendant's unlawful conduct and its anticompetitive effects cease to exist.**

82.     Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, members, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members and staff.

83.     Plaintiff reserves the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

84.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

85.     Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These questions include but are not limited to:

    a.    Whether Defendants have entered into a formal or informal agreement, conspiracy, or common understanding to artificially inflate the price and/or artificially suppress the supply of multifamily residential real estate units from competitive levels;

    b.    If Defendants entered into a formal or informal agreement, conspiracy, or common understanding, whether that conduct violates Section 1 of the

18

Sherman Act under the '*per se*', 'quick look', or 'rule of reason' modes of analysis.

 c. If Defendants entered into a formal or informal agreement, conspiracy, or common understanding, whether such conduct has in fact artificially inflated the price and/or artificially suppressed the supply of multifamily residential real estate units from competitive levels;

 d. The proper measure of damages; and

 e. The appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

86. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

87. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff will fairly and adequately represent and protect the interests of the Class Members. No Plaintiff has a disabling conflict of interest with any other Member of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class, and the infringement of rights and the damages they have suffered are typical of other Class Members. Plaintiff also has retained counsel experienced in complex class action and antitrust litigation, and they intend to prosecute this action vigorously.

88. As provided under Fed. R. Civ. P. 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct in relation to the Class and making final injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole.

19

Defendants' policies challenged herein apply to and affect Class Members uniformly, and Plaintiff challenges these policies by reference to Defendants' conduct with respect to the Class as a whole.

89.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

90.     Consistent with Fed. R. Civ. P. 23(b)(3), class treatment is superior to all other available methods for the fair and efficient adjudication of this controversy. Among other things, it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Moreover, class action treatment will permit the adjudication of relatively modest claims by Class Members who could not individually afford to litigate a complex claim against large corporations such as Defendants. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

91.     Particular issues, such as questions related to Defendants' liability, are also appropriate for certification under Fed. R. Civ. P. 23(c)(4) because the resolution of such common issues would materially advance the resolution of this matter and the parties' interests therein.

92.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1), in that the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish

incompatible standards of conduct for Defendant. Prosecution of separate actions by Class Members also would create the risk of adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

## COUNT I

## AGREEMENT IN RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

93.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

94.     Defendants and Lessors have formed a cartel to artificially inflate the price of, decrease and disguise the supply of, and output of multifamily residential real estate leases from competitive levels.

95.     The Defendants' cartel has caused the Class to suffer overcharge damages.

96.     There are no precompetitive justifications for the Defendants' cartel, and any proffered justifications, to the extent legitimate, could be achieved by less restrictive means.

97.     The Defendants' cartel is unlawful under a per se mode of analysis. In the alternative, the Defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

## COUNT II

## VIOLATION OF SECTION I OF THE SHERMAN ACT FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION

98.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

21

99.    Beginning at a time currently unknown to Plaintiff and members of the Class, Defendants, Lessors, and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations in violation of the Sherman Act.

100.    Defendants' acts in furtherance of their conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

101.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce in the United States.

102.    The exchange of information by Defendants consisted of detailed, competitively sensitive, and non-public information about pricing plans and strategies.

103.    Defendants' regular information exchanges through RealPage show concerted action between horizontal competitors in the multifamily residential real estate market.

104.    Defendants' pricing algorithm encouraged Defendants to adhere to a common pricing system that would artificially inflate prices, while artificially suppressing output.

105.    Defendants' actions have caused rental prices throughout the country to substantially increase, directly harming the average consumer.

106.    As a result of Defendants' unlawful actions, Plaintiff and class members have been forced to pay inflated, supracompetitive prices.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and all Class Members, request judgment against Defendants and that the Court grant the following:

a.    An Order certifying the Class, as defined herein, and appointing Plaintiff and their counsel to represent the Class;

b.    A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Act under either a *per se*, quick look, or rule of reason mode of analysis.

c.    A judgment enjoining Defendants from engaging in further unlawful conduct.

d.    For an award of reasonable attorneys' fees, costs, and litigation expenses, as allowed by law;

e.    For an award of damages, including actual, statutory, consequential, punitive, and nominal damages, as allowed by law in an amount to be determined;

f.    An award of pre- and post-judgment interest on all amounts awarded; and

g.    Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  March 16, 2023

/s/ Gerald J. Rodos
Gerald J. Rodos (Bar No. 3652)
Jeffrey A. Barrack (Bar No. 78438)
Andrew J. Heo (Bar No. 326289)
**BARRACK, RODOS & BACINE**
2001 Market Street, Ste. 3300
Philadelphia, PA  19103
Tel.: (215) 963-0600
Fax: (215) 963-0838
grodos@barrack.com
jbarrack@barrack.com
aheo@barrack.com

Stephen R. Basser*
Sam M. Ward*
**BARRACK, RODOS & BACINE**
600 West Broadway, Ste. 900

23

San Diego California, CA 92101
Tel.: (619) 230-0800
Fax: (619) 230-1874
sbasser@barrack.com
sward@barrack.com

/s/ Bruce W. Steckler
Bruce W. Steckler (Bar No. 308481)
**STECKLER WAYNE & LOVE PLLC**
12720 Hillcrest Road, Ste. 1045
Dallas, TX 75230
Telephone: 972-387-4040
Facsimile: 972-387-4041
bruce@swclaw.com

OF COUNSEL:
/s/ Paul D. Stickney
Paul D. Stickney*
12720 Hillcrest Road, Ste. 1045
Dallas, TX 75230
Telephone: 972-387-4040
judgestick@gmail.com

*Attorneys for Plaintiff and the Proposed Class*

*pro hac vice application to be filed*